The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw a line and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Good morning. Good morning. Can I get you to hear argument on first case number 17, 1853? Good morning, Your Honors, and may it please the Court. The University of South Carolina's Student Non-Discrimination and Non-Harassment Policy, Staff 6.24, regulates speech without regard to First Amendment limits and operates as a de facto speech code. It is unconstitutional on its face and does not apply. The plaintiffs in this case, the college libertarians and its former president, Ross Abbott, and the Young Americans for Liberty, found that under these policies it is risky even to discuss the issue of free speech on campus without the threat of punishment. The decision below upholding the policy's application to the plaintiffs and its refusal to consider the facial challenge are both wrong and should be reversed. I'll briefly start with just the issue of standing because I think here the issue should be fairly obvious. The defendants tried to have it both ways on the issue of standing. First, they argued that the free speech event itself for which the plaintiffs received a notice of charge is exempt from the policies, and yet they argued that they had no choice but to conduct an investigation. Wasn't part of the problem that some of the complaints alluded to things that were said sort of on the scene? There wasn't a lot of detail about that? Right. That became the post hoc rationalization the University used. But if you actually look at the complaints, and they appear as attachments to our complaint at pages 66 to 76 of the joint appendix. They don't say that somebody made sexist and racist statements? As sort of an offhand statement, that was said, but if you read the gist of the complaints, they're all complaining about the nature of the free speech event itself. Not all of them. And I thought it was significant that at least one of the complainants referred to behavior, to conduct, as well as. Right. There was the one offhand reference in complaint number one. What makes it offhand? And how is behavior offhand? It doesn't explain expressly what was said. Hence the need for the meeting, right? Excuse me? Hence the need for the meeting. But the meeting didn't explore the behavior at the event. And the transcript is available in the joint appendix. You have 45 minutes of meeting, and not a single question is asked about behavior. Instead, what you have is Mr. Wells asking questions like, what is your group? Why did you have the event? What were the signs about? All the things that were explained in advance. Contextual, perhaps, to understand the nature of what occurred? I'm sorry, I didn't hear your question. Perhaps the questions were asked to establish the context of what occurred, including the behavior and the comments? Well, that's right. But the context was explained in advance when the event was approved. It was explained to be a free speech event. Now, if the context, if the nature of the event as an academic event is all that matters, then that could have been decided two minutes into the meeting. But there were no questions about behavior, no questions about anything that happened. And if you look at the complaints themselves, in particular the photographs that were alongside the complaints, the photographs showed smiling students talking casually with people in front of tables. There was no indication other than a characterization with no facts that this was racist, sexist, and someone was rude. But beyond that one sentence in one complaint, all of the complaints talked about the fact that there were signs we didn't like, we thought that this was hate speech, and so on. The very things that were explained to Ms. McMahon, the director of student life, before the event was approved. And as a matter of fact, the students who organized the event said, there may be some controversy about this because these are free speech issues that have happened on other campuses, and we want to explain as part of this event their context and how they were decided. That was all known going into the meeting. The meeting with Mr. Wells didn't ask anything but that. What was the context, and the same information was provided. There was no attempt to find out whether or not there was any problematic behavior at all. And if, as the university has argued, that all that matters is if it's an academic event, it's exempt, then A, they knew that in advance, and B, that was explained in the first two minutes of the meeting. So why it was necessary to go through the rest of the process is really kind of a mystery to me. But had there been any problematic event, that could be explored. And by the way, the gist of the as-applied challenge is that if there had been complaints about behavior, that could have been done without sending a notice of charge to the students. That could have been done any number of less restrictive ways, like first reading the face of the complaints and seeing if there was any allegation of any specific problematic behavior. If that didn't answer the question, then talking to the complainants. When you say there were sexual or racist remarks, what were you talking about? What did you refer to? How is that? It's just a sort of a genuine kind of common sense question. How is that less restrictive? Are you saying you wouldn't be here, your clients would not have felt their speech was chilled if instead of talking to them, the university had launched sort of an investigation on its own into what happened and had asked around about them? You wouldn't be right back here saying that chilled their speech plus it depended on them? It would have depended on what they did with that information. But certainly it would have been the case. What did they do to you with that information? That's what I don't really understand about this whole argument. Well, if they had found some reason to be concerned about the behavior, actual indication that there was something other than the event as advertised, then if they had looked further into it, that would have been another matter. But here, rather than conducting any inquiry from the complainants or anything else, they started the process by sending a notice of charge to the student speakers and then Okay, so if this thing had not said it was a notice of charge but just asked the students to come in, then what? Would you still be here then? Yes, we would because See, that's what, if they did anything, you would be here. What I'm saying by that is that whether or not you call it a notice of charge or not, the substance of what they did in the letter was the problem. In what you Sorry, go ahead. I think what you're encountering is perplexity as to what you expected the school to do. Just as a practical matter, when confronted with complaints not only of speech but of behavior that occurred after approval was obtained without any way to know that what transpired during the event comported with what was expected to occur in the initial document seeking. So I think, or let me not attribute it to anybody else. My question is what, in your view, could the university reasonably have done in response to complaints? We listed a number of them both in our merits brief. Well, help me now. Yes, and as we explained there, to review the complaints to see what the actual allegations were. Why do you not believe that happened? And why would that necessarily bring it into it? Well, if the complaints had specifically said someone got in a fight, these people confronted each other, that would have been specific information to pursue. But instead, you have ten pages of complaints, all of which say we didn't like the symbols, we think this is hate speech, we think you should revoke student funding for these organizations. That was the thrust of the complaints. And one phrase said that there were rude, sexist, and racist remarks. Now, had that been the focus of what the school was interested in, that would have been something Mr. Wells would have asked at the meeting. He asked zero questions about behavior at the event. But you've gone beyond my question. My question was what could have reasonably been done at the time. And you started by saying it could have been pursued with the complainants, but now you're acknowledging that that wouldn't have been enough, even in that circumstance, that the school would have had to go further than just talk to the complainants. And I find it a little, it seems improbable to me that the plaintiffs would have been happier had the school stopped just by talking to the complainants and issued and begun an investigation instead of communicating with the plaintiffs directly. Well, I'm not saying that talking to the complainants would have alone been enough, but it would have been a start. As a matter of constitutional law, it's in the First Amendment somewhere that the university, the order of operations the university has to follow in doing this inquiry. It has to start with the complainants. It may not start with the complainants. That's in the First Amendment. What's the case that says the First Amendment requires that? Susan B. Anthony List v. Gryhaus. Susan B.? Go ahead. Where it says there needs to be a process for screening out insubstantial or frivolous complaints. Why couldn't this be the process? I'm sorry? Why wouldn't this be the process? Well, the process wouldn't begin with sending a letter that imposes a gag order on students. Okay. But we just have established, I thought just a few minutes ago with you, that it wouldn't matter what this letter had been titled. If it had said to the students, would you come in and chat with us about this, you would still be here challenging the First Amendment. So that isn't your answer. That isn't what got it done. But the letter said more than, will you come in and chat with us. I understand that. But what if the letter had just said, would you come in and chat with us? And I thought you had told me just five minutes ago that you'd still say there was a First Amendment challenge. Okay. So what part of the First Amendment says that? Again, I think the part that says you have to use the least restrictive means in screening complaints and specifically, it's Susan Bianco and Elizabeth Dryhouse, a method for screening out insubstantial complaints. But this is it. A discussion with the person whose interests are affected would be, at least on its face, a fairly non-restrictive way to screen out. And, in fact, did screen out, did it not, as a point of fact, because no investigation was forthcoming and plaintiffs were notified that there would be no investigation? They were notified on December 23rd, two weeks after the meeting, that they weren't going to pursue this further investigation. But there was no explanation, as Mr. Abbott had asked for, of explaining why, what the policy was. No reason was given in this three-sentence letter from Mr. Wells what the decision was. So the school's not taking action is actionable? The school's decision not to pursue an investigation is also part of what you're complaining about? No. We're saying that the method, the way in which they pursued the investigation, they didn't pursue an investigation. In fact, during the meeting, as I recall from the transcript, the plaintiffs were told that the meeting was about deciding whether or not to pursue an investigation. Is that not correct? That's right. So that was, in fact, the screening process that you feel that plaintiffs were entitled to. But as Mr. Abbott said during the meeting, I feel like you're shooting first and asking questions later. Coming into the meeting, they were told they could not speak to anybody, either members of the faculty or staff or student body, about the complaint. They were told that they should mediate. And if you look at the policies, Staff 624 says mediation means asking firmly but politely to cease the offensive behavior, meaning you should silence yourself. All of the processes going in favored the complainants. And, you know, in the course of the meeting, you could have, well, before the meeting even, you could have reviewed the complaints, talked to the complainants. If that prompted a call to the people who had hosted the event that said, tell us what happened, that's one thing. But the letter that went out to them did much more than that. It assigned a complaint number, described it as a formal complaint, said that the office will attempt to resolve the complaint through mutually agreeable mediation, which the policies describe as asking people to cease their behavior. It said that if we can't mediate, we will move to investigate the complaint. What impact does Abbott graduating have on the complaint? Does it move the claims for injunctive or declaratory relief? No, because Mr. Abbott was acting in his role as president of the College Libertarians. Was anyone else subject to this process that you find objectionable other than Mr. Abbott? Well, the organizations were, both the organizations, College Libertarians and Young Americans for Liberty. The complaints weren't sent to Mr. Abbott personally. The complaint package was delivered to him as president of the College Libertarians. But the fact that he has graduated certainly doesn't boot up that aspect of the case. And he has his individual claim for damages from this as well. So his graduation doesn't affect the claim. I'd only asked about declaratory and injunctive relief. Right, but that would apply to the organizations. And as the school policies explain, and as Mr. Abbott raised during the meeting, he was concerned because the penalties for having found to be in violation include desanctioning the organization's and other kinds of penalties beyond just individual penalties. But as I say, when the process starts with a letter that tells students they cannot speak and it ends with a letter that doesn't explain why that decision was made, there was no assurance whatsoever that this wouldn't have a continuing chilling effect. When I have some familiarity with the process, and when in the sexual harassment or sexual assault context, for example, a student files a complaint, one of the routine communications to the person who is the subject of that is not to communicate with the person who made the complaint because it smacks of retaliation. Are there not competing pressures there? There might be in terms of telling them not to speak to the complainants, but in terms of saying you cannot speak to anybody. And in particular, Mr. Abbott said, I was concerned I couldn't speak to Kim McMahon, the director of student life, who knew about the event and had approved the event in the first place. And because of this gag order in the notice of charge, he wasn't able to have that communication. What was the date on which the, quote, gag order was sent out? It was sent out on November 24, 2015. And when was the meeting? The meeting was a couple of weeks later. So he was gagged with a winter break then? It sounds like it. The gag order specifically lasted about a month if you accept as the end date the December 23rd letter. But the December 23rd letter contained no explanation whatsoever of what the other implications were. I understand. You had these two problems. You, first of all, think that this is a gag order in the beginning, and you think that there needs to be an explanation at the end. Okay. We take away those two things. Where's your client? Well, the client. In other words, just come in and talk to us. No gag order. We'd like to chat with you. And don't tell him anything because, according to you, you can't even tell what the subject is. That would be bad, wouldn't it? Then you wouldn't have known what the complaint was. Then you'd have a vagueness challenge. Well, I think we do have a vagueness challenge based on the face of the policies. But here, where there's no explanation of why the decision was made, as explained during the meeting. But your client surely knows why the decision was made because your client maintains he did nothing wrong. So that would be the basis of the decision, right? My client maintains he did nothing wrong. Right. But at the same time, he acknowledged that the policies allow a misdemeanor complainant to take the matter further to the university president or to the Department of Education. Except that he was told that they wouldn't. And he was told that actually during the meeting. Part of what they were talking about was whether to undertake the investigation that didn't happen. And you're also complaining about the fact that there was no explanation about why the investigation that you're complaining about didn't happen. It really doesn't seem to me that there is anything, from your perspective, that the university could have done in this situation except ignore the complaints altogether. No, and, Your Honor, that's not what we're asking. And I see my time has expired, but I'd like to answer your question. And that is. I would love that. As Mr. Abbott said in the letter sent to the university, under Staff 624, there are provisions where a finding of no harassment is found, where the university can explain to the students why that is true. Is that required? Excuse me? Is that required? No, it's not required, but he asked it so that we would know how these policies can be applied consistently with the First Amendment rights of students to speak on campus. Okay, thank you. You've reserved some time for rebuttal. Good morning. My name is Carl Muller. I'm from Greenville, South Carolina. It's a pleasure to be here with you today. My job, as I understand it, is to assist the court in understanding the case. So my first question is, do you have any questions? We will ask you questions if we have them. Don't worry about it. You just go ahead and tell us what you want to tell us. If it's helpful, you might just want to start with justiciability and talk about if there is an issue about whether or not Abbott's claims for declaratory and injunctive relief are moot. As a starting point. Well, his claims are moot because there's no remedy that the court can give here today that would have any effect on him because he's no longer a student there. So that's the short answer to that question. And in his representational capacity as president of the group with which he is involved, is declaratory and injunctive relief moot because he is the leader of this organization that continues to exist? Well, he's the only one that got the letter from Carl Wells. The two organizations did not get a letter from Carl Wells. So they are not in a position even to ask for the relief. This is a particularly interesting case to me and perhaps to you as well because this involves not simply the First Amendment, which is one part of the Constitution. This involves three parts of the Constitution. And the appellants have really only paid attention to one part of the Constitution, which is the First Amendment. But really it involves Article III, which is whether there's a case or controversy here, which is a constitutional question. And it involves equal protection because we have here issues of discrimination, which have constitutional origins. So this is not a case where the court looks to the First Amendment as only the constitutional issue. There are three constitutional issues here, which makes the interplay between them particularly important. I might note that Policy 624 is not simply related to sex discrimination or sex harassment. It's related also to any sort of discrimination, and it specifically refers to proscribing only illegal discrimination. It's very clear what the university is trying to do, which is to protect the rights of all of the students, whether they are First Amendment rights, which are mentioned at the outset of 624, or their rights to equal access. What purpose is served by instructing Mr. Abbott not to speak to members of the faculty or staff? Well, there are a couple points there. One is privacy considerations, privacy considerations for the complainants, privacy considerations for potential witnesses. But the letter, the November 24th letter, as I recall, didn't disclose the names of the complainants. So that would not have – did it? There may have been at least one, one that was disclosed. In the letter to him? I believe so. I'm looking at day 66, which is the notice of charge, and there is no reference to the name of the complainant. Not in the letter itself. That's my point. My point is, what privacy concerns of the complainants would be implicated if that information wasn't known? I believe it may have been in the complaints that were sent with the letter. I see. In addition to that, there's the matter of potentially the person who the complaints have been lodged against getting other people then to serve his purpose to retaliate against the complainants. Assuming that they knew who – If you know who made the – if I, for example, have a complaint made against me, and I know who made the complaint, I can get somebody else to go after it. Yes. Thank you. So that's an issue. Another thing I'd like to point out to the court is the Davis case on which they place so much emphasis. That's not a case that sets the contours of what constitutes discrimination. That's a case that sets a very high bar about what is required in order to find an implied cause of action under Title IX against a school or a university receiving federal funds. In that case, even in that case, Justice O'Connor says that we are not simply here looking at what is the level of discrimination, what constitutes discrimination. We're looking at something much higher, which is what allows us, even under the spending clause of the United States Constitution, which is the basis of the implied cause of action, to assess monetary damages against a school or a university. So that's a case that doesn't set the standard for what is discrimination. I have a question. I'm sorry to bounce you off Davis, but can I ask you a question about just the facts around the free speech event? Yes, ma'am. I mean, it does seem like a pretty big deal for a student to get a letter from the university that refers to a notice of charges, requires them to set up this meeting within five days, don't talk about it. Are you conceding that at least sort of in the time period right after the letter arrives and until the meeting or maybe the final disposition of this matter, that for some time period there, you know, a reasonable student would have felt the need to self-censor, that there was some injury there for First Amendment purposes? No. The district court got that wrong, you think? No. In fact, this whole... I'm sorry. Did the district court get that wrong? The district court got that wrong. And how come? This whole case looks like a calculated effort on the part of the complainants, not the complainants against Mr. Abbott, but Mr. Abbott and his consorts, to pick a fight with the university. Well, I don't think that's an unfair characterization, but that is the way a lot of our constitutional rights get established. There aren't the people that obey nicely and go quietly into the good night. They are the people that stand up on popular causes that establish our First Amendment rights. And so I don't think that's... You may be right on that, but I don't think that helps you much. It's fine to pick a fight, and I've picked some fights myself. But what... If they have a First Amendment right to do this, it doesn't matter how unpleasant you think it is. But if I pick a fight, chances are I'm not going to be chilled. That's my point. Oh, I don't know about that. No. You're wrong. It's a reasonable person when you're chilled. And I just don't see this. I mean... Can you give us some objective basis for why you don't see it? I mean, the district court found that a reasonable person in Mr. Abbott's position would have felt chilled, and that there is some intuitive weight to that because the letter looks like a letter I would not want to get from the head of the university. Don't talk to people. Enclosed is a copy of the notice of charge  Please contact this office within the next five days. I would not be happy to find that letter in my mailbox. The reason I don't think he was chilled is a couple of reasons. One is he had received preclearance from the university to do this. Well, then that's a more reason to be chilled. Well, not really. I thought you were doing something that was within the... Not really, because now I know that I've got Kim McMahon in my corner. All I have to do is go to Kim McMahon, and she'll clear this up. He was told not to talk to anybody. Ma'am? I thought the instruction in the letter was that he was not to talk to anyone. Wouldn't that include Kim McMahon? If you read the letter... Yes, it includes faculty, staff... But that was a request. That was not a command. That was a request. Please also refrain... I guess you could read that as a request.  Would you please answer my question? Would you regard that as a request or a command? Did Mr. Abbott talk to people about... Well, he certainly talked to Mr. Crike, who came in with him. And I doubt, seriously, that he drafted that three-page letter that he showed up with, which means that he probably talked with somebody else. Are we in the record? Is that in the record? Yes, ma'am, it's in the record. He showed up with a three-page letter. No, I understand that, but the question about whether he himself drafted it, is that... He was not asked that. So the answer to her question is no. The answer to the question is it's not in the record, but it sort of speaks... No, I think you have quite a lot to work with in the record. It would help me a lot if you could confine yourself to the record, and then I can go back and review it and verify it. My point is that a reasonable inference from the way that letter is drafted is that a student did not draft that letter. Why? I would hope that the university would be so proud of the academic accomplishments of its student body that it would be happy to attribute a sophisticated letter. We are. We are. He also looked at the... The record also says that he looked at the policy. 6.24 does not even have a place for a notice of charge in there. 6.24 does not even have a place for a notice of charge. That is an entirely different section, which is 1.01. So you're saying that a reasonable student getting this letter would think... It may seem like a big deal because it says notice of charge, but it's not because I know there should be a notice of charge. I'm just trying to figure out... Putting to one side Mr. Abbott, because it is an objective test, would a reasonable student getting this letter really feel free to continue speaking while this matter was under consideration? Putting aside Mr. Abbott, I can go either way on that because it's hard for me to say what is a reasonable person. Well, then the district court couldn't bear. I'm sorry? The standard is a reasonable person. It's not just Mr. Abbott. So the district court didn't bear. I can't come down solidly one way or the other on what's reasonable here. Okay, well then let's agree that the district court didn't err and move on from there. The district court did not err in finding that a reasonable person in Mr. Abbott's position would have found this children. I'm not going to say that the district court erred. Well, you actually have, but now we're moving forward. And I don't have to have that as the basis of my argument. Correct. Okay, so moving along. Moving along, you know, I'm done here unless you have any questions. How about articulating the compelling interest of the university? Preventing discrimination, making sure that it's open to everybody to get an education. Discrimination that Mr. Abbott is alleging against those who make politically insensitive, incorrect statements. Would you acknowledge that that is also a form of discrimination? I think that what we have to do here is we have to protect the rights under the First Amendment to freedom of speech. And Mr. Abbott doesn't have rights under the First Amendment? He absolutely does, and that's why the second paragraph of 6.24 recognizes the importance of the First Amendment. See, nobody disagrees with that. And the reason that your response is just not being very helpful to us is that we understand, at least I do, I think I understand, what the university is trying to do here. And I understand what the challenge is. And the university can do something, but what we are trying to do is to look at what they did do, what their regulations do say, and how they fit into constitutional requirements. And so just saying you're going to answer our questions, okay, answer that question. How does this policy further and comply with constitutional requirements? When we get a complaint about discrimination, we have to make an inquiry just to see what happened, to see if there's anything there. And if there's nothing there, that's the end of it. This is just an inquiry. It's not an investigation. And to me, the best way to do that is to ask both sides as quickly as you can, what happened? We got something from one side. We asked the other side. What happened? But at the meeting, and I did read the transcript of the meeting, and I don't want to really fault the university for its conduct of the meeting because mostly it was Mr. Abbott making his speech, but why didn't the university ask what happened? Like there's an allegation out here. I'm not sure this really matters to Mr. Abbott's complainants, but if I were the student who had made the complaint about the racially and sexually hostile behavior at the scene, I'd be kind of concerned that the university never asked about what happened on site in light of those complaints. Why didn't that come up at the meeting? Mr. Wells just asked it in an open, completely open-ended way. He could have said what happened, and he didn't. He said, tell me about it, which is a much more open-ended way of addressing the situation. And she pointed out Mr. Abbott was not hesitant to talk about things. He carried the conversation. And Mr. Wells said at the end, is there anything else you want to tell me? When did the university establish this code? About two years prior. Two years before the incident? Yes, ma'am. And it remains the same? It remains the same. You know, speech codes all over the country are being challenged. Are you the university's lawyer? I'm the university's lawyer in this case, only in this case. The university doesn't have a lawyer on staff, does it? The university has a general counsel on staff. It has an associate general counsel on staff as well. I read somewhere that the policy was reviewed by counsel. I read somewhere in this. This policy was the outgrowth of an investigation with the United States Department of Justice and the United States Department of Education. And the policy was prepared by Nelson Mullins Riley, a law firm in South Carolina, reviewed by the Department of Justice, reviewed by the Department of Education, and only then implemented. So the policy. You're saying the policy has been vetted? Considerably, considerably. That would have been interesting for you to bring out earlier. I thought that was brought out in the briefs adequately, and that's why I didn't mention it. Is it based on some other policy? Is there a model? It's an attempt. The Federal Register actually has a note here. The Federal Register, from November 2nd of 2000, talks about how this policy is an attempt to bring it in line with the Davis case. It's not exactly the same wording as the Davis case, but they interpret this policy as a way to be attentive to the Davis case. Was there input or just collaboration with the Department of Justice and the Department of Education? It was the Department of Justice and the Department of Education. It was both of them. Yes. My question was, was there input from them or just collaboration or review? It was both. It was both. It was a very detailed inquiry because this was an effort to get it right and not have to go back and revisit it and hopefully not be here. I'm sorry. Did you feel that? You don't want to be here. The first time I've ever seen a lawyer that doesn't want to tell us what his side is. That's what you want to do? Go with God? It's been a pleasure. Can I ask you, because I didn't seem to be getting much ground on the other side, do you just feel that no policy is possible? No. Is that your argument? No, that's not our position. And our position is that as the Fourth Circuit's position was in 1993 in Sigma Chi fraternity versus George Mason University, that the policies simply have to take into account First Amendment values and adhere to First Amendment limits. But you see, that isn't very helpful because obviously there has been an effort to take into account First Amendment values here. Maybe it's an imperfect effort. So saying it has to take that into account just doesn't really... Well, first let me address the questions that the panel just had about whether or not this was vetted by the Department of Justice. The relevant pages in the record are pages 236 to 256 of the joint appendix, where that is the 2009 investigation. The investigation was because of discrimination in sororities on campus. And so after the Department of Justice investigation, this policy was adopted to deal with that. Now, there's no discussion of whether or not the First Amendment aspects were considered. It was simply this was the policy done to settle that investigation in the Department of Justice to deal with discrimination in fraternities and sororities. And as counsel indicated, this isn't just a speech code. This is about all forms of discrimination. So there's no indication that there was an attempt at that time to deal with the concerns about the First Amendment. Now, in terms of the process for dealing with complaints... Of course, the Department of Justice would have no reason to be familiar with concerns about the First Amendment. Not always, and sometimes they have shown more concern than others. A 2003 Dear Colleague letter from the Department of Education, for example, working with the Department of Justice, said that universities should take into account First Amendment values. Later departments backed away from that and took a more lax standard. But whether or not the federal government has taken one position or another doesn't affect the legal standard as established by court decisions. And here, when you're dealing with the process and you have to use the least restrictive means, as in the district court you do, then at least according to the Supreme Court United States v. Playboy Entertainment Group, then when you have plausible, less restrictive options that are available, it is the government's burden to prove that they would not be effective. Here, rather than start with a letter that says, here are the things that you must do, come in five days later, mediate, do not speak to anybody, we listed a number of options that were available, including... But if it's a burden, is it not to prove that those are actually less restrictive? That is the government's burden, yes, under strict scrutiny. So the government doesn't think they're less restrictive. So who decides? You say they're less restrictive. They don't look less restrictive to me. The school doesn't concede they're less restrictive. So how do we resolve that question? Well, when you impose burdens on the speaker first, rather than looking to see whether or not there actually is a case here and one that is not inconsistent... And there are tons of cases that say you can't shut down the speech without first making some inquiries. But that's not what happened here. The cases you're pointing to are cases where they're actually told, stop talking before the inquiry takes place. That didn't happen. But subsequent punishment is equally constitutionally offensive as a prior restraint. And here what we're talking about is the threat of subsequent punishment after speaking. And it was started, initiated, with a letter that says you cannot speak to anybody. Can I just ask you just a factual question about that? What does the record show about whether Mr. Abbott talked to anybody about this? I'm just trying to figure out how, in effect, there would have been threat. He did talk to at least the person he brought with him to the meeting. Yeah, this is in the record. He brought Mr. Creedy with him because he was the president of the other organization. So he did not literally understand that as precluding him from speaking to anybody. Because the complaints were about these two organizations. And as the representative of the other organization named in the complaints, that was the only other person that Mr. Abbott spoke to. Does the record show that that's the only other person he talked to? Yes, it does. And, in fact, Mr. Creedy – Where is that? I believe it's in Mr. Abbott's declaration that was attached to the pleadings. Okay, I'll find it. Okay. But he also said in the same declaration, I believe in paragraph 11, that he wanted to speak to Kim McMahon, but could not because he felt like he was constrained by the letter. If the panel has no further questions, thank you. Thank you very much. We will come down and greet the lawyers and then go directly to our next piece.
judges: Diana Gribbon Motz, Allyson K. Duncan, Pamela A. Harris